FELVER A. ROWELL, JR. AND BETTY C. ROWELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rowell v. Commissioner
Docket No. 3445-85.
United States Tax Court
T.C. Memo 1988-410; 1988 Tax Ct. Memo LEXIS 441; 56 T.C.M. (CCH) 11; T.C.M. (RIA) 88410; September 1, 1988; As amended September 6, 1988 E. J. Ball, for the petitioners. Frank D. Armstrong, Jr., for the respondent. KORNER
MEMORANDUM OPINION KORNER, Judge: In a timely statutory notice of deficiency, respondent determined income tax deficiencies and additions to tax for petitioners' 1977, 1978 and 1979 taxable years as follows: Addition to Tax
Year
Deficiency
Section 6653 (b) [1]
1977
$ 34,449.88
$ 17,224.94
1978
41,450.38
20,725.19
1979
26,879.19
13,318.79
After concessions, we are presented with the following issues for decision: (1) Whether petitioners' reported income was understated in each year in issue; (2) whether petitioners have met the requirements of section 274 in substantiating their claimed travel and entertainment expenses; (3) whether *446 petitioners have substantiated various expenses claimed on Schedules C and E of their returns in excess of those allowed by respondent; (4) whether petitioners have proven entitlement to depreciation deductions with respect to various assets purportedly used by Felver Rowell in his trade or business in excess of the amounts allowed by respondent; (5) whether petitioners are entitled to depreciation deductions with respect to rental properties in excess of amounts allowed by respondent; (6) whether petitioners are entitled to a deduction claimed in 1979 with respect to a $ 4,000 contribution to Felver Rowell's HR 10 (Keogh) Retirement Plan; (7) whether petitioners are entitled to a $ 1,150 interest expense deduction claimed on their 1978 tax return; (8) whether any portion of any underpayment of tax required to be shown on petitioners' return for any of the tax years in issue is due to fraud; or alternatively, whether any underpayment of tax due for any tax year in issue is due to negligence or intentional disregard of rules or regulations. Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this *447 reference. For convenience, we have combined our Findings of Fact and Opinion and present them in groupings by issue, with the exception of the general or background information which is so labeled. General Background
Petitioners are husband and wife who resided in Morrilton, Arkansas, during the tax years in issue and at the time they filed their petition herein. Petitioners have three daughters, two of whom resided with them during the taxable years in issue. Petitioners are cash basis calendar year taxpayers who filed joint returns for each tax year in issue. Felver Rowell is an attorney by profession. He is a sole practitioner whose practice consists primarily of the representation of accident victims in personal injury actions. During 1977 and 1978, Mr. Rowell also served as the assistant prosecuting attorney for Conway County, Arkansas. Mr. Rowell also operated a tax return preparation business out of his law office. Most of the tax preparation work was actually performed by Mr. Rowell's office manager, Karen Porterfield, [2] with the assistance of the office staff. The Rowells also own several rental properties located in Morrilton and the surrounding areas *448 and derived income from interest, dividends and a gain in 1978 from the sale of stock. Adjustments to Gross Income
a. Law Practice Petitioners maintained a bank account at First State Bank, Morrilton, for use by Mr. Rowell in his law practice (the business account). Petitioners maintained a second account at First State Bank for personal transactions (the personal account). Petitioners determined gross receipts reflected on the Schedule Cs attached to their 1977, 1978 and 1979 tax returns by starting with total annual deposits made to the business account. "Deposits" were to be increased for income not deposited, [3] and decreased for various adjustments deemed necessary to properly reflect gross receipts. Petitioners prepared summary sheets reflecting the amount of gross receipts to be shown on the Schedule Cs. These summary sheets were given to petitioners' CPA, Kent Dollar, who prepared petitioners' tax returns for the years in issue from information contained in the summary sheets. *449 Petitioners' negative adjustments to gross annual deposits can be classified as follows:
1. Client Settlements - represent personal injury lawsuit settlements allegedly received by Mr. Rowell on behalf of his client and deposited into the business account. Since these amounts, less Mr. Rowell's fee and expenses, were required to be remitted to the client, the amount due to the client was excluded from gross receipts.
2. Redeposits - represent the alleged redeposit of checks into the business account which had been returned as uncollectible after their initial deposit. To avoid double inclusion of the check in gross receipts, total deposits were reduced by redeposits.
3. Other Expenses/Non-Income Items - total receipts were also reduced by various other deposits which petitioners claim did not constitute income, and expenses which petitioners claim were deductible as business expenses. In his notice of deficiency, respondent determined that petitioners had understated gross receipts from Mr. Rowell's law practice by $ 10,526.59, $ 10,475.51 and $ 7,336.52 for 1977, 1978 and 1979, respectively. The understatements were all attributed by respondent to erroneous *450 reductions in gross receipts made by petitioners. Of the adjustments made in the notice of deficiency, the following remain in dispute: 1977
1978
1979
Client Settlements
$   580.02
$ 1,040.68
Redeposits
3,553.09
$ 2,725.66
1,852.12
Canadian Business Trip [4]
3,145.48
Cabin and Motor Home Expense [4]
722.00
2,566.27
Bad Debts [4]
1,500.00
Client Promotions (Canadian Trip) [4]
3,193.72
$ 9,500.59
$ 5,291.93
$ 6,086.52
Additionally, petitioners claim that gross receipts should be reduced by the following additional items not originally claimed on their returns: 1977
1978
1979
Client Settlements
$ 692.80
Redeposits
$ 750.92
Canadian Business Trip [5]
$ 2,862.02
Cabin and Motor Home Expense [5]
215.53
"Hot" Checks
582.50
Returned Checks
600.00
$ 750.90
$ 3,660.05
$ 1,292.80
*451 It is well established that bank deposits are prima facie evidence of income where the deposits were made by the party charged with income or to an account controlled by the party charged with income. Tokarski v. Commissioner,87 T.C. 74, 77 (1986). Petitioners bear the burden of disproving respondent's determinations. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). (i) Client Settlements 1977 - Respondent disallowed reductions in gross receipts for the following three checks totaling $ 580.02, which petitioners identified as client settlements: Payee
Amount
IRS
$  15.02
Cash
500.00
Capital Anesthesia Group
65.00
$ 580.02
Respondent's disallowance of reductions in gross receipts for these amounts is sustained. None of these checks were actually "client settlements." Mr. Rowell testified that the $ 15.02 check to the IRS was in payment in taxes due from one of his tax return preparation clients who did not have a bank account. The client allegedly paid the $ 15.02 in cash to Mr. Rowell who then wrote a check to IRS in payment of the clients' tax liability. *452 Although we found Mr. Rowell's testimony credible in this regard, he failed to provide any evidence establishing that the $ 15.02 received in cash was then deposited into the business account. Petitioners have thus failed to prove that a reduction in gross receipts for this amount is proper. Similarly, Mr. Rowell testified that the $ 65 check payable to Capital Anesthesia Group, although in payment for services provided to Betty Rowell, should result in a reduction of gross receipts since petitioners had earlier deposited into the business account an insurance settlement received to satisfy this debt. Petitioners offered no evidence other than Mr. Rowell's own self-serving testimony that any insurance proceeds were received or that they were deposited into the business account. We found this testimony to be unpersuasive. Mr. Rowell testified that $ 500 should be excluded from gross receipts for the $ 500 check made payable to cash. Mr. Rowell testified that this check was cashed and the proceeds deposited into a petty cash fund for use in payment of sundry office expenses while Mr. Rowell was away from the office. However, the check itself bears no notation indicating that *453 it was used for this purpose, nor have petitioners produced any of the petty cash receipts allegedly filled out by office personnel when making disbursements from the fund to establish that the funds were expended for business purposes. Respondent's disallowance of a reduction in gross receipts for this item is therefore sustained. 1979 - Petitioners dispute disallowance of $ 1,040.68 of reductions in gross receipts for "client settlements" in 1979, as well as $ 692.80 in additional offsets to total deposits not claimed on their return. These amounts are evidenced by the following cancelled checks: Disallowed per Stat. Notice
Petitioner's Additional Claims
Payee
Amount
Payee
Amount
Radiology Assoc.
$ 313.00 Michael Hill and
IRS
24.20
Felver Rowell, Jr.
$ 167.80
IRS
38.40 Annie Foster and
Collection Services, Inc.
164.88
Felver Rowell, Jr.
525.00
Cash
500.00
$ 1,040.68
$ 692.80
Mr. Rowell offered the same explanation of the $ 62.60 of IRS checks as was given for the $ 15.02 check to IRS discussed earlier. Respondent's determination as to these checks is thus sustained for the same reasons as his disallowance of *454 that $ 15.02 check. The $ 313 check to Radiology Associates bears a notation that it was in payment for treatment provided petitioners' daughter, Rochelle. Mr. Rowell testified that the check was in payment for treatment of Rochelle as a result of an automobile accident, and that insurance proceeds covering this amount had been deposited into the business account. We found Mr. Rowell's testimony in this regard self-serving and unpersuasive. Since no evidence other than Mr. Rowell's self-serving testimony was offered as to deposit of any insurance proceeds into the business account, respondent's disallowance of a reduction in gross receipts for this item is sustained. Mr. Rowell testified that the $ 164.88 check payable to Collection Services, Inc. was in payment of a client's medical expenses. Mr. Rowell further testified that he had promised to pay the bill if the client did not. Petitioners offer no evidence, other than Mr. Rowell's own self-serving testimony that the check is a proper reduction of gross receipts. The check itself bears no notation indicating that it was written for the purpose stated, nor was an invoice from Collection Services, Inc. put into evidence. *455 Petitioners have thus failed to carry their burden of proof and respondent's determination is sustained. The check to cash in the amount of $ 500 bears the notation "Kansas Bird Hunting Trip." Mr. Rowell testified that the trip to Kansas was made in order to interview a witness in a pending case. Mr. Rowell testified that two friends of his, Mr. Cox and Mr. Epperson, accompanied him and went bird hunting on the witness' land while Mr. Rowell interviewed the witness. We find Mr. Rowell's explanation of the notation on this check incredible and unworthy of belief. It is inexplicable why he would label the check in such a manner without making any reference to the purported business nature of the trip. Petitioners have failed to prove that the $ 500 constitutes a proper reduction of gross receipts and respondent's disallowance is sustained. The $ 692.80 in additional reductions in gross receipts sought by petitioners for tax year 1979 is made up of two items. Each is a check made payable to Mr. Rowell and another. One check bears the notation "Loan Repayment." Mr. Rowell testified that he wrote such checks whenever a client repaid sums previously advanced. The client would *456 endorse the check which would then be retained by Mr. Rowell as a receipt evidencing the repayment. Respondent's denial of offsets to gross receipts for these two items is sustained. In order to prove entitlement to such an offset, petitioner would have to prove that a loan had in fact been made and that the repayment was deposited into the business account. Since petitioners have offered proof of neither except for Mr. Rowell's own self-serving and unpersuasive testimony, respondent's determination is sustained. (ii) Redeposits 1977 - Petitioners dispute respondent's disallowance of gross receipt reductions for $ 3,553.09 of "Redeposits" in 1977. Additionally, they seek an additional $ 750.92 in gross receipt reductions for redeposits not shown on their return. In order for redeposits to be proper reductions in arriving at gross receipts, it must first be established that the same item had been previously deposited into the business account so that the same item appears in the deposit total twice. Petitioners have failed to satisfy this requirement. They have failed to point out an initial deposit which the redeposit duplicates. Respondent's determination is thus *457 sustained. 1978 - Respondent disallowed reductions in gross receipts for the following "Redeposits and Other non-income items" in 1978: Wages, Shown on 1040
$ 1,203.16
Rents, Shown on Sch. E
790.00
"Hot Checks":
Ray Hardin
30.00
Billy Bostian
150.00
Bill Phelps
52.50
Bill Robertson
500.00
$ 2,725.66
Petitioners contest disallowance of gross receipts reductions for the Hardin, Phelps and Robertson "hot checks." They also contest disallowance of $ 600 of the rent adjustment. Again, reduction of gross receipts for the hot checks is only proper if it is shown that the checks initially entered into calculation of total deposits. Petitioners have failed to show this and respondent is thus sustained on this issue. The rent adjustment relates to rental income received by petitioners. Rental receipts were deposited into the business account with the exception of income received from rental of a property to one of petitioners' daughters. Since rental income was reported on Schedule E, it is necessary to reduce gross receipts by rental income deposited in the business account in order to arrive at gross *458 income to be included on Schedule C. Petitioners erroneously reduced gross receipts by the total rents appearing on Schedule E, including that received from their daughter and not deposited into the business account. Respondent's spread sheet indicates $ 2,980 of rent receipts were deposited into the business account in 1978. Thus petitioners were entitled to reduce gross receipts by $ 2,980 to avoid duplication rather than the $ 3,770 claimed. Respondent's disallowance of the $ 790 difference is sustained. 1979 - For tax year 1979, petitioners dispute respondent's disallowance of $ 1,852.12 of "redeposits and non-income items." The checks comprising this total are as follows: Payee
Amount
IRS
$   205.52
IRS
1,482.08
State of Arkansas
119.69
IRS
23.04
State of Arkansas
22.60
$ 1,852.93
Petitioners also contend that the 1979 receipts should be reduced by $ 600 of returned checks not reflected on their return. Petitioner claims checks payable to the Internal Revenue Service and the State of Arkansas were in payment of taxes owed by tax return preparation clients who paid cash to Ms. Porterfield. Ms. Porterfield then allegedly deposited *459 the cash into the business account and drew the check. Since no evidence other than petitioner's own self-serving testimony has been offered proving that the cash was in fact deposited into the business account, respondent's disallowance of these amounts is sustained. Respondent concedes that petitioner had returned checks in 1979 of $ 600 as claimed by petitioner except that one $ 50 check appears to have been listed twice in petitioners' listing. Since petitioner is a cash basis taxpayer, he is not required to record the amount of income represented by these checks until they are honored. We therefore find that petitioners' reduction of gross receipts for $ 550 of returned checks in 1979 is proper. b. Tax Return Preparation In addition to his legal activities, Mr. Rowell also operated a tax preparation service out of his law office. There was no set fee schedule for tax preparation services. Most clients paid the preparation fee with cash, although some paid by check. Ms. Porterfield testified that receipts from tax preparation, whether of cash or checks, never flowed through the business bank account. Rather, Ms. Porterfield testified that they were retained by her *460 in a petty cash fund and used to pay various office expenses. She also testified generally that there was never a large surplus in this petty cash fund, that all receipts were eventually used to pay office expenses. Ms. Porterfield testified that she prepared and delivered to Mr. Rowell an accounting for all receipts and disbursements of tax preparation fees. The accountings and supporting documentation were turned over to Kent Dollar, CPA for preparation of petitioners' income tax returns. Petitioner has been unable to produce any of this supporting documentation, claiming it was misplaced while in either Mr. Dollar's or respondent's custody. The only documentation of tax preparation fee income offered by petitioners were three typewritten pages which summarized the results of such activities as follows: 1977
1978
1979
Tax Preparation charges
$ 9,319.50 $ 7,840.00 $ 8,606.00 Less:
Stamps, forms, copies, supplies etc.
(715.00)
(365.00)
(296.40)
Client lunches, travel, mis.
extra help
(3,595.50)
(2,635.00)
(1,725.00)
Charges not collected
(215.00)
(85.00)
Net Income
$ 5,009.00 $ 4,625.00 $ 6,499.60 *461 Respondent's agent, Anne DeSalvo, testified that Mr. Rowell had initially denied conducting a tax preparation service. The Schedule Cs attached to petitioners' returns do not state the results of tax preparation activities separately. Rather, petitioners claim that this net income is included in the total gross receipts figure appearing on line 5 of Schedule C. In order to estimate the amount of tax preparation fees received by Mr. Rowell, Ms. DeSalvo contacted the service center which was able to provide her with the information that 236 taxpayer 1978 returns and 228 taxpayer 1979 returns bore petitioner's social security number as the preparer number. She averaged these numbers and subtracted 10 percent to arrive at an estimate of 208 as the number of returns prepared by petitioner in 1977. She then eliminated all deposits to the business account which she could identify and treated the average of the unidentified deposits as the average net tax return preparation fee. Thus respondent determined the following unreported tax preparation fees: No of
Year
Returns
Avg. Fee
Total
Reported
Unreported
1977
208
$ 118.05
$ 24,555.00
$ 2,961.00
$ 21,594.00
1978
236
123.03
29,036.00
2,345.00
26,691.00
1979
228
132.92
30,306.00
5,967.00
24,339.00
*462 We sustain respondent's finding of unreported tax preparation fees in the amounts determined in his statutory notices of deficiency. Under section 6001, a taxpayer is required to keep sufficient records to enable respondent to compute the taxpayer's correct tax liability. In the absence of such records, respondent is authorized to use any method of computation which in his opinion clearly reflects the income of the taxpayer. Sec. 446; Sutherland v. Commissioner,32 T.C. 862, 867 (1959). The method adopted by respondent must be reasonable in light of all the surrounding circumstances. Giddio v. Commissioner,54 T.C. 1530, 1533 (1970). In this case, petitioner's records as to his tax preparation activities are virtually nonexistent. In fact, petitioner initially denied to respondent's agent that he had engaged in any significant tax preparation activities. Petitioners put into evidence a summary sheet prepared by Ms. Porterfield purporting to show the calculation of gross receipts contained on line 5 of the Schedule C attached to their 1977 Form 1940, including $ 5,010 of net tax return preparation income. However, respondent placed in evidence *463 a similar worksheet, also acknowledged to have been prepared by Ms. Porterfield, which shows no income from tax preparation fees. [6] The worksheet for 1978 does not mention tax preparation fees except for a separate sheet which shows $ 7,840 of tax preparation fees offset by $ 8,500 of business expense. However, nowhere on the Schedule C is there an indication that the $ 560 deficit was deducted. Petitioners provided no evidence showing that the gross receipts amount on line 5 of the 1979 Schedule C included tax return preparation receipts. We find the summary sheets offered by petitioners of little probative value. Under the circumstances, respondent's method of reconstructing petitioner's tax preparation income was reasonable and appropriate. Petitioners bear the consequences of any inaccuracies in respondent's determinations since they are directly attributable to their failure to maintain adequate records. Respondent's determinations in this regard are accordingly sustained. *464 Travel and Entertainment Expenses
Petitioners contest respondent's disallowance of $ 3,145.48 and $ 3,193.72 of deductions related to "Canadian Business Trip" expenses in 1977 and 1979, respectively. [7] Additionally, petitioners seek a deduction for $ 2,862.02 not initially taken on their 1978 return for a Canadian business trip. These amounts, petitioners claim, represent the costs of an annual fishing trip to Canada. Mr. Rowell was accompanied by Wiley Cox, Bob Epperson and Bill Wofford on the fishing trip in each year at issue. Petitioners claim that expenses of the fishing trip were expended entertaining people who were of assistance in the production of income and thus deductible under section 162 as ordinary and necessary business expenses. Mr. Rowell identified Wiley Cox as the local high school principal and claimed that he had many cases referred to him by Mr. Cox. Mr. Epperson is petitioners' son-in-law and clerk of the circuit court. Mr. Rowell *465 claimed that Mr. Epperson kept him informed of the goings on at the court house and referred many cases to him. Mr. Wofford is director of Federal programs within the local school system and also referred cases to him according to Mr. Rowell. Petitioners also owned a mountain cabin and a motor home during the tax years in issue. They kept several small boats at the cabin. Mr. Rowell testified that he used the cabin to entertain clients and for limited family use. He estimated that the cabin was used 75 percent of the time for entertaining business clients. In support of his contention, petitioners introduced a log book bearing the names and dates of use of guests at the cabin. The log does not indicate what business relationship the guests had to Mr. Rowell. Mr. Rowell testified that he was usually not present when guests used the cabin. Mr. Rowell also testified that the motor home was used to entertain clients. He stated that the motor home was used to take business clients on hunting trips and to football games. The motor home was also used on the Canadian fishing trips. He estimated that the motor home was used 80 percent of the time for business. For 1977 and 1978, *466 petitioner claimed an offset against gross receipts for cabin and motor home expenses of $ 722 and $ 2,566.27, respectively, which respondent has denied. Petitioners also claim an additional offset of $ 215.53 for 1978 which did not appear on their return. In addition to travel and entertainment expenses claimed as offsets to gross receipts, petitioners claimed additional amounts as deductions for travel and entertainment on Schedule C. The amounts claimed by petitioners, and the amounts disallowed by respondent are as follows: Claimed
Disallowed
1977
$ 1,742.78
$ 1,628.98
1978
1,853.84
1,428.08
1979
3,066.49
2,368.44
Mr. Rowell testified that the disallowed amounts were for the entertainment of clients at the Morrilton Golf and Country Club and small gifts which were given to business clients. Petitioners introduced into evidence the canceled checks evidencing these expenditures. Business related expenditures are generally deductible if they constitute "ordinary and necessary expenses" as defined in section 162. However, expenditures for entertainment must also satisfy the more restrictive business-relationship standards of section 274(a) *467 and substantiation requirements of section 274(d) to be deductible. Entertainment expenses are only deductible if the taxpayer establishes that the expenditure is "directly related to" the active conduct of the taxpayer's trade or business, or "associated with" the active conduct of a trade or business and the entertainment is directly preceded or followed by a "substantial and bona fide business discussion." Sec. 274(a)(1)(A). Expenses with respect to an entertainment "facility" are deductible only if the facility is used primarily for furtherance of the taxpayer's business and the expenses are directly related to the active conduct of the taxpayer's trade or business. Sec. 274(a)(1)(B). Assuming without deciding that the entertainment expenses in question were paid and satisfy the section 162 "ordinary and necessary" test, petitioners have failed to prove that the additional requirements of section 274(a) have been satisfied. Respondent's determinations are therefore sustained. Petitioners have not introduced any evidence that substantial and bona fide business discussions occurred during the Canadian fishing trip or on any of the occasions when business clients allegedly *468 used the cabin or motor home. Indeed, Mr. Rowell testified he was usually not present at the time clients used the cabin. The expenses in question therefore cannot be said to have been "associated with" the active conduct of Mr. Rowell's business. For an expenditure to be "directly related to" active conduct of the taxpayer's business the taxpayer must have had more than a generalized expectation of deriving income or a specific business benefit at some indefinite future time from those entertained. Sec. 1.274-(2)(c)(3)(i), Income Tax Regs. Also, the taxpayer must have actively engaged in a business meeting, discussion etc., during the entertainment period. Sec. 1.274-(2)(c)(3)(ii), Income Tax Regs. Mr. Rowell's testimony indicates at most that he expected his entertainment to do no more than create goodwill which may or may not have resulted in concrete business benefits at some indeterminate future time. He thus has failed to meet the section 274(a) requirements for deductibility of business entertainment with respect to the fishing trips, cabin or motor home. Likewise, petitioners have failed to prove entitlement to deductions for amounts which Mr. Rowell testified were *469 spent on business gifts. Assuming the requirements of section 162 are satisfied, business gifts are deductible only up to $ 25 per donee per year. Sec. 274(b). In order to substantiate entitlement to a deduction for business gifts, the taxpayer must establish by adequate records or sufficient evidence corroborating his statements: 1. The cost of the gift; 2. the date and description of the gift; 3. its business purpose; 4. the taxpayer's business relationship with the person receiving the gift.
Sec. 1.274-5(b)(1), Income Tax Regs.
The only documentary evidence presented by petitioners to substantiate their deductions were canceled checks used for the purchase of gift items. These checks do not establish who the gifts were given to; when; the business relationship of the donee to Mr. Rowell; or that the cost of each individual gift was within the $ 25 ceiling. Petitioner therefore failed to satisfy the section 274(d) substantiation requirements with respect to these deductions and respondent's determinations are thus sustained. Other Business Expenses
Respondent, in his notice of deficiency, disallowed various portions of deductions claimed by petitioners *470 under a number of categories. Section 162(a) allows as a deduction all the ordinary and necessary expenses paid or incurred during the tax year in carrying on a trade or business. However, deductions are matters of legislative grace and the taxpayer bears the burden of substantiating his claimed deductions. New Colonial Ice Co. v. Helvering,292 U.S. 435, 440 (1934); Deputy v. duPont,308 U.S. 488, 493 (1940). Each category of contested deduction is discussed separately below. (a) Bad Debts Petitioners contest respondent's disallowance of $ 1,500 in bad debt deductions taken by them in 1977. At trial, Mr. Rowell testified that it was his practice to advance funds for expenses to his clients pending resolution of their lawsuits. If the client did not win his case, he was not required to repay the sums advanced. Petitioner introduced into evidence the following four checks totaling $ 1,700 which he claims were advances to clients which became uncollectible in 1977 and thus deductible in that year: Payee
Amount
Cash (Endorsed by A. J. Stacks)
$ 1,000
Luella Donald
250
Stephen Williams
200
Felver Rowell from
Caldwell Farm Supply
250
[8] $ 1,700
*471 To qualify for a deduction for a worthless debt, the taxpayer must first prove the existence of a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. Sec. 1.166-1(c), Income Tax Regs. As to the first three checks, each was drawn on petitioner's business account and bears a notation indicating that the payment was a loan. As to these checks, petitioner has proven that a bona bide debtor-creditor relationship was created. [9] The fourth check is in the amount of $ 250 and is drawn by Caldwell Farm Supply on Morrilton Security Bank and payable to petitioner. The check bears a stamp indicating it was returned for insufficient funds. The reasonable inference to be drawn from this check is that it was given in repayment of a debt owed to petitioner. Thus a debtor-creditor relationship for this check has also been established. *472 Once the existence of the debt has been established, petitioner must next show that the debt became worthless in the year in which the deduction was claimed in order to establish entitlement to the deduction in that year. The question of whether a debt becomes worthless during a taxable year is to be determined on the basis of the surrounding facts and circumstances, and the burden of proof is on petitioner. Mueller v. Commissioner,60 T.C. 36, 41 (1973), affd. on this issue 496 F.2d 899 (5th Cir. 1974). As to the check returned for insufficient funds, we find that the fact of the worthlessness of the debt of which the check was to be repayment has been established. The fact that the check was presented and dishonored, accompanied by petitioner's testimony that Caldwell Farm Supply had gone out of business, is sufficient to establish the worthlessness of the $ 250 debt. As to the debts represented by the three checks drawn on petitioner's business account, proof of their worthlessness has not been established. As to the check in the amount of $ 1,000 endorsed by A. J. Stacks, petitioner has failed to prove that $ 980.50 in loan repayments made *473 in 1978 by Mr. Stacks do not relate to this loan. Although Mr. Rowell testified that this repayment related to another loan, he did not offer into evidence a check disbursing funds for this purported other loan. Mr. Rowell also testified that the $ 200 repayment from Steve Williams in 1978 did not relate to the $ 200 loan made to Steve Williams in 1977, but was payment from another Steve Williams. Since petitioners have failed to introduce the loan check payable to this other Steve Williams, we conclude that the $ 200 advanced in 1977 was in fact repaid in 1978. We also note that this check was dated December 22, 1977, and find Mr. Rowell's testimony that the case was settled unfavorably to his client less than 10 days after the advance was made unworthy of belief. The final check in the amount of $ 250 and payable to Luella Donald is dated December 13, 1977. We find Mr. Rowell's testimony that the loan represented by this payment became worthless prior to the end of the calendar year incredible. In the absence of any other evidence that this debt became worthless prior to yearend we sustain respondent's disallowance of these three bad debt deductions. (b) Utilities *474 Petitioners dispute disallowance of the following deductions for utility expenses which they deducted on the Schedule C of their income tax returns: 1977
$ 1,127.26
1978
1,424.84
1979
1,051.15
The deductions disallowed relate to utility expenses incurred by petitioners with regard to their cabin, and expenses of a second telephone line into petitioners' residence. In both instances, respondent's disallowances are sustained. Our finding as to the cabin expenses taken as an offset to gross receipts is dispositive as to the issue of the deductibility of the cabin utility expenses as well. Petitioners have failed to comply with the requirements of section 274 and are thus not entitled to a deduction. Mr. Rowell testified that he had the second telephone line installed because his employment as assistant prosecuting attorney required that people be able to contact him at all times. He further testified that his daughters were forbidden from using this line. The cost of maintaining a telephone is deductible as a business expense if the use of the telephone is directly related to the taxpayer's earning of income. Roth v. Commissioner,17 T.C. 1450, 1455 (1952). *475 However, if the telephone's primary purpose is personal, rather than business, no deduction is allowable. See International Artists, Ltd. v. Commissioner,55 T.C. 94, 105 (1970). We find Mr. Rowell's stated reasons for installation of the second telephone line incredible. Both lines were listed in the telephone directory and both lines were available for use by anyone calling the residence. One listing was under the name of Mr. and Mrs. Rowell, while the other was listed in the names of their two daughters then living at home. We find that both lines were for the personal use of the family. Neither was dedicated to business use as alleged by petitioner. Therefore, no part of the expense of maintenance of the second line is deductible as a business expense. (c) Office Repairs Petitioners contest respondent's disallowance of $ 660.71 of deductions claimed on their 1977 Schedule C as office repairs. Petitioner testified that the amounts were for a lavatory, rewiring in the office bathroom to accommodate new lighting, a towel rack installed over the commode, and electric work on an office icebox. Generally, no deduction is allowed for the expenditure *476 of amounts which add to the value or prolong the useful life of property owned by the taxpayer. Sec. 1.263(a)-1, Income Tax Regs. Petitioners have failed in their burden of proving that the expenditures in question were deductible repairs and not capital expenditures. The only evidence introduced by petitioners was the canceled checks evidencing the expenditure and petitioner's general testimony as to the nature of the work performed. The work performed in the bathroom appears to be in the general nature of a remodeling and would increase the value of the office. Petitioner's testimony as to the electrical work on the icebox does not provide any basis for determining that the work merely maintained the property in ordinary operating condition rather than prolonging its useful life. Respondent's determination is thus sustained. (d) Automobile and Travel Expenses Petitioners claimed Schedule C deductions for use of their automobiles in Mr. Rowell's trade or business. The amount of deduction claimed and the portion disallowed by respondent are as follows: Claimed
Disallowed
1977
$ 7,794.90
$ 6,235.92
1978
7,518.90
5,848.12
1979
10,180.61
8,144.49
*477 Petitioners operated between six and seven vehicles, including the motor home, during each tax year in issue. Of these vehicles, petitioner claimed that four -- a Jeep Wagoneer, a station wagon, a Thunderbird, and the motor home -- were used for business purposes in 1977. In 1978, a Cadillac and a Porsche were substituted for the station wagon, as business vehicles. In 1979, the Jeep, Cadillac, Porsche and motor home were used as business vehicles according to Mr. Rowell's testimony. In 1977 and 1979, petitioners claimed 100 percent of amounts identified as automobile expenses as business deductions. In 1978, they claimed 90 percent. In each year, respondent allowed 20 percent of the automobile expenses as business deductions and disallowed the remainder. Under section 162, automobile expenses are deductible if the automobile is used in furtherance of the taxpayer's business rather than for personal use. Boyd Construction Co. v. United States,339 F.2d 620, 623 (Ct. Cl. 1964). If an automobile is used for both personal and business purposes, but no record establishing the percentages of business and personal use is maintained, respondent's determination *478 must stand. Boyd Construction Co. v. United States, supra.
We found Mr. Rowell's testimony as to the business use of his vehicles to be vague and general. No logs, receipts, or other business records were presented to substantiate the claimed business use of the vehicles. Under these circumstances, we consider respondent's allowance of 20 percent of automobile expenses as business deductions extremely generous. Respondent's disallowance of the remainder is sustained. (e) Office Supplies Petitioners claimed Schedule C deductions for office supplies which were disallowed or capitalized by respondent as follows: Claimed
Allowed
Capitalized
Disallowed
1977
$ 7,996.27
$ 6,154.71
$ 1,841.56
-
1978
8,301.68
4,056.36
1,090.61
$ 3,154.71
1979
2,146.02
1,274.31
159.65
712.06
Petitioners concede disallowance of the deductions which respondent determined should be capitalized, which disposes of 1977, but argue that they are entitled to additional deductions of $ 2,551.76 for 1978 and $ 661.67 for 1979 in excess of those allowed by respondent. [10]
*479 Petitioners presented copies of canceled checks to substantiate their claimed deduction in 1978. For 1979, they claim that the checks described in their schedule of disputed deductions were misplaced during trial preparation. Mr. Rowell testified that the checks identified were paid to purchase office supplies used in his business. Also included in this group were checks written to purchase coffee, soft drinks and snacks for clients and office staff. Twenty-one of the disputed checks in 1978 and ten in 1979 totaling $ 490.39 and $ 422.27, respectively, were payable to Piggly Wiggly, a grocery store. Mr. Rowell testified that these expenditures were for coffee, soft drinks, snacks, etc., for clients and staff. Many of the checks bear notations indicating the expenditure was for "Groceries." We found Mr. Rowell's explanation of these expenditures credible and the amounts reasonable. We thus concede that petitioners have met their burden of proof as to deductibility of these items. For 1978, the $ 44.10 check payable to the Photo Shop, Inc. bore a notation that it was for projector repair. Mr. Rowell's explanation that the projector was used in his personal injury practice *480 was credible and we therefore conclude that a deduction for this amount is proper. Mr. Rowell testified that the $ 334 check to Sakowitz was for gifts to his office staff. Deductible business gifts are limited to $ 25 per person per year. Sec. 274(b). Therefore respondent's disallowance of $ 259 of this $ 334 amount (i.e., allowance of $ 25 deduction per office worker) is sustained. Of the remaining checks, many bear no notation as to the purpose of the expenditure while others merely bear the notation "office supplies" or "miscellaneous office expense." Such vague references are insufficient to prove petitioners' entitlement to deductions for the amounts expended. Respondent's disallowance is thus sustained as to these amounts. For 1979, petitioner is allowed a deduction for the $ 422.27 of checks payable to Piggly Wiggly. As to the remainder, petitioners have failed to prove entitlement to the claimed deductions and respondent's disallowance is sustained. Our resolution of the office supplies expenses which were in controversy is thus summarized as follows: 1978
1979
Contested Expenses
$ 2,551.76 $  661.67 Allowed Deductions
Piggly Wiggly
(490.39)
(422.27)
Photo Shop, Inc.
(44.10)
Disallowance Sustained
$ 2,017.27 $  239.40 *481 (f) Insurance Expense Petitioners dispute respondent's determinations as to allowable insurance expense claimed on Schedule C during each of the years at issue. For taxable year 1977, respondent disallowed $ 1,504.33 of the $ 2,348.74 of insurance expense claimed by petitioner on their Schedule C. Petitioners dispute $ 371.10 of the disallowance. For taxable year 1978, respondent disallowed $ 744.50 of the $ 2,669.24 in insurance expenses claimed on Schedule C. Petitioners dispute $ 656.95 of the disallowance. For taxable year 1979, respondent disallowed $ 1,330.26 of the $ 3,992.83 of insurance expense claimed on petitioners' Schedule C. Petitioners dispute $ 541.01 of the disallowance. [11]
In 1978 and 1979, petitioners deducted $ 2,164.24 and $ 3,186.35, respectively, as insurance expense on Schedule E. Respondent disallowed $ 1,139.58 of the amount claimed in 1978 and $ 1,050.16 of deductions claimed in 1979. Petitioners concede disallowance of $ 490 in 1978 which was payment of the premium on their *482 homeowners' policy. All of the amounts disallowed relate to premiums on policies covering petitioners' motor home, cabin, boats kept at the cabin, and various vehicles owned and operated by petitioners during the tax years in issue. Respondent's disallowance as to expenses relating to the cabin, motor home and boats is sustained. Petitioners have failed to prove entitlement to deductions with respect to these assets in accordance with section 274. Respondent is also sustained in his disallowance of deductions for automobile insurance since petitioners failed to offer into evidence any log books or other business records which would establish the percentage of business use of the vehicles. [12]
Depreciation - Schedule C
Petitioners deducted the following amounts as depreciation expense on Schedule C: 1977
$  8,197.00
1978
12,430.39
1979
12,316.00
Respondent *483 determined that petitioners were entitled to Schedule C depreciation of $ 2,410.84, $ 2,678.79 and $ 2,522.49 for 1977, 1978 and 1979, respectively, and disallowed the remainder. The depreciation deductions claimed by petitioners and disallowed by respondent are summarized below: 1977
1978
1979
Motor Home
$ 1,221.00 $ 1,117.00 Cabin
1,850.00 1,387.00 Float Boat
923.00 929.00 Bass Boat
2,286.00 Thunderbird
1,132.00 912.00 Mercury
864.00 Porsche
3,321.50 Building
653.00 $ 5,990.00 $ 10,605.50 Less:
Capitalized Items
(191.84)
(386.86)
Addtl. Jeep Deprec.
(220.00)
Addtl. Office Furn. Deprec.
(237.58)
Computational Adj.
(12.00)
(9.46)
Net Adjustment
$ 5,786.16 $ 9,751.60 $ 9,793.51
A separate schedule detailing composition of petitioners' Schedule C depreciation was attached to petitioners' 1977 tax return. No such schedule was attached to their 1978 return; however, at trial petitioners produced a schedule detailing Schedule C depreciation for that year. Petitioners have provided no detail as to the 1979 depreciation expense which appears on their tax return *484 as a lump sum deduction. As to 1977 and 1978, petitioners have failed to prove entitlement to Schedule C depreciation in excess of amounts allowed by respondent. As stated previously, petitioners have failed to establish that they are entitled to deductions with respect to the motor home, cabin or boats pursuant to section 274. Petitioners have also failed to provide convincing evidence establishing the percentage of business use of the various automobiles Mr. Rowell claims to have used in his business. The depreciation schedule attached to petitioners' 1977 return indicates that the building was fully depreciated as of that year. Neither at trial nor on their return did petitioners provide a breakdown showing the composition of the Schedule C depreciation claimed in 1979. Respondent allowed $ 2,522.49 in depreciation based on the business assets, useful lives, and cost bases he had been able to ascertain from prior years. Given petitioners' total failure to offer any evidence in support of the $ 12,316 figure claimed on their return, respondent's determination as to 1979 Schedule C depreciation is sustained. Depreciation - Schedule E
In each of the years at issue, *485 petitioners attached a Schedule E to their Federal income tax return on which they reported the results of operations of various rental properties petitioners owned. Petitioners deducted the following amounts of depreciation expenses on the Schedule Es attached to their returns: 1977
$ 13,695
1978
20,460
1979
18,629
Respondent disallowed depreciation of $ 4,507.83 in 1977, $ 3,559.32 for 19778, and $ 3,993.59 for 1979. Respondent's adjustments are summarized as follows: Adjustments
1977
1978
1979
Apartment House (including
furniture and parking lot)
$ 1,081.00 ($   747.94)
($   387.67)
Rental Houses
3,437.67 4,437.34 4,451.34 Capitalized Repairs
(10.84)
(130.08)
(130.08)
Net Adjustment
$ 4,507.83 $ 3,559.32 [13] $ 3,933.59
Petitioners gave no explanation as to their depreciation calculations with regard to the apartment house other than the sketchy details *486 appearing on the returns themselves. It appears that the bulk of respondent's adjustment of depreciation claimed on the apartment building in 1977 was made to account for the fact that petitioners owned the apartment building for only a portion of the year. See sec. 1.167(a)-10(b), Income Tax Regs. Respondent also determined that petitioners had a depreciable basis in the parking lot of $ 4,000 as opposed to the $ 10,000 claimed by petitioners. Petitioners have not contested respondent's determination that the apartment building was acquired on September 22, 1977. Nor have they submitted any evidence contradicting respondent's determination as to their basis in the parking lot. Petitioners have thus failed to prove their claim for depreciation on the apartment house in excess of that allowed by respondent. Similarly, the discrepancy between depreciation claimed by petitioners and allowed by respondent on the rental houses is attributable to a dispute as to petitioners' depreciable basis in these properties. Here too, petitioners have failed to offer any evidence to corroborate their own assertions as to the basis of these assets. They have therefore failed to prove entitlement *487 to depreciation on the rental houses in excess of that allowed by respondent. H.R. 10 Plan Payment
Petitioners claimed a deduction in 1979 for a $ 4,000 payment to a Keogh (H.R. 10) Retirement Plan maintained by Mr. Rowell at the First National Bank of Conway. Petitioners introduced into evidence a letter dated August 15, 1980, from First Federal Savings and Loan (First Federal) to the First National Bank of Conway (First National) instructing that the accompanying check for $ 4,000 be deposited into Mr. Rowell's Keogh account. Respondent disallowed the deduction after determining that the funds were not deposited into the Keogh account, if at all, until September 30, 1980. Contributions to an HR 10 Retirement Plan are only deductible for the year in which the contribution is actually made. Sec. 404(a)(1). Section 404(a)(6) provides that contributions made no later than the time for filing the return for a given year (including extensions) are deemed to have been made on the last day of the preceding taxable year. Petitioners secured extensions of time until August 15, 1980, within which to file their 1979 tax return. Thus petitioners must establish that their contribution *488 to the HR 10 Retirement Plan was made on or before August 15, 1980, in order to be entitled to a deduction with respect to the contribution in 1979. Respondent's reliance on section 404(h)(1)(B) is misplaced. That section applies to employer contributions to Simplified Employee Pensions as defined at section 408(k), not HR 10 Retirement Plans, and is therefore inapplicable. Based on the record before us, we find that petitioners have failed to prove that their contribution was made within the period required by law for entitlement to a deduction in 1979. Respondent introduced into evidence photocopies of the Keogh account ledger sheets from First National indicating no contribution was in fact made within the prescribed time period. Petitioners failed to refute the validity of the exhibit. The letter dated August 15, 1980, from the First Federal to First National is insufficient to meet petitioners' burden of establishing that the deposit was in fact made on that date. See Gillis v. Commissioner,63 T.C. 11, 17 (1974). [14]
Interest Expense
Petitioners claimed *489 interest deductions on Schedules A, C and E of $ 11,777.98 and $ 26,964.70 in 1977 and 1978, respectively. Respondent determined that petitioners could only substantiate $ 11,134.67 and $ 17,453.01 of their respective 1977 and 1978 deductions and disallowed the remainder. Petitioners concede all of respondent's interest expense adjustments with the exception of a $ 1,150 item in 1978. Petitioners contend that a check dated June 21, 1978, payable to Love Supply, Inc., in the amount of $ 1,150 was in payment of interest. However, the check bears no notation that would indicate it was payment of interest. The only evidence that the payment was of interest is Mr. Rowell's own self-serving testimony. We find this testimony falls short of that required for petitioners to have satisfied their burden of proof as to this item. Respondent's determination is therefore sustained. Additions to Tax
(i) Fraud Respondent determined an addition to petitioners' tax for each year for fraud under section 6653(b). Respondent has the burden of proving fraud under section 6653(b) by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Stone v. Commissioner,56 T.C. 213, 220 (1971); *490 Otsuki v. Commissioner,53 T.C. 96, 105 (1969). To meet this burden, respondent must establish by clear and convincing evidence: (1) that petitioners had an underpayment of tax; [15] and (2) that some part of the underpayment was due to fraud. Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court; Otsuki v. Commissioner, supra at 105. The existence of fraud is a question of fact that we must resolve upon considering the entire record. Teitelbaum v. Commissioner,294 F.2d 541, 547 (7th Cir. 1961), affg. a Memorandum Opinion of this Court; Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977). Fraud is never presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970); Otsuki v. Commissioner, supra.Respondent must show *491 petitioners' intent to evade taxes that they knew to be owing by demonstrating their conduct of concealing, misleading or preventing the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court,; Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). Respondent rarely can show fraud by direct proof of the taxpayers' intention, but may show fraud by circumstantial evidence. Rowlee v. Commissioner, supra at 1123; Stone v. Commissioner, supra at 223-224. The taxpayers' entire course of conduct may be examined to establish the requisite fraudulent intent. Stone v. Commissioner, supra at 223-224; Otsuki v. Commissioner, supra, at 105-106. The training and experience of a taxpayer must also be considered in relation to allegations of fraud. See Solomon v. Commissioner,732 F.2d 1459, 1461 (6th Cir. 1984), affg. a Memorandum Opinion of this Court; Iley v. Commissioner,19 T.C. 631, 635 (1952). Making *492 implausible or inconsistent explanations of behavior is evidence of fraud. See Bradford v. Commissioner,796 F.2d 303, 307 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Gromacki v. Commissioner,361 F.2d 727, 730 (7th Cir. 1966), affg. a Memorandum Opinion of this Court. Respondent urges that the addition to tax for fraud be imposed on petitioners for each year at issue. In support of his argument, respondent asserts that petitioners consistently and substantially understated their income over the three-year period in issue, and that such understatements are strong evidence of fraud. He places particular emphasis on petitioners' tax return preparation activities. He also alleges that petitioners' fraudulent intent is evidenced by the taking of numerous tax deductions for personal expenditures or expenditures for which documentation establishing deductibility did not exist. Finally, respondent contends that Mr. Rowell made false and misleading statements to his investigating agent and submitted false documents, both of which evidence fraudulent intent. After careful consideration of all of the evidence, we conclude that respondent *493 has clearly and convincingly proven that petitioners fraudulently underpaid their taxes for each year in issue. The consistent omission of large amounts of income is evidence of fraudin and of itself. Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court; Estate of Hill v. Commissioner,59 T.C. 846, 856 (1973). Respondent, however, need not prove the precise amount of the underpayment resulting from fraud; rather, he need only prove by clear and convincing evidence that there is an underpayment. Otsuki v. Commissioner, supra at 105. Respondent has done this for each of the years at issue. Ms. DeSalvo, respondent's examining agent, was able to determine that 236 returns filed for 1978 and 228 returns for 1979 bore Mr. Rowell's social security number as the return preparer. The actual number of returns prepared in his office was probably higher since Ms. Porterfield testified she sometimes used her own social security number as the preparer number. It is reasonable to infer that Mr. Rowell's office prepared over 200 returns in 1977 also. Yet Ms. DeSalvo's analysis of the *494 bank deposits into the business account identify only 25 deposits in 1977; 19 deposits in 1978; and 45 deposits in 1979 as being from tax return preparation. We also have the testimony of Faye Ward, a teller at First National Bank, that Mr. Rowell often cashed checks rather than deposit them into his business account. The record, therefore, establishes that petitioners omitted substantial portions of the income generated through his tax preparation activities during each year at issue. The making of false or misleading statements to investigating agents is also evidence of fraud. McGee v. Commissioner,519 F.2d 1121, 1126 (5th Cir. 1975), affg. 61 T.C. 249 (1973); Beaver v. Commissioner, supra at 93. The examining agent, Ms. DeSalvo testified credibly that Mr. Rowell initially told her he prepared only a few returns for friends at no charge. Only after Ms. DeSalvo received additional information indicating Mr. Rowell's substantial tax return preparation activities were they acknowledged by Mr. Rowell. Additionally, the Schedule Cs attached to each return do not disclose that Mr. Rowell derived any income from tax return preparation. *495 At the beginning of Ms. DeSalvo's examination, a summary of 1977 Schedule C income was furnished to her which likewise did not identify any income from tax preparation fees. However, a second 1977 income summary was subsequently furnished to respondent after Ms. DeSalvo was made aware of Mr. Rowell's return preparation activities. This summary does show $ 5,010 in tax preparation income. However, it also shows $ 5,010 in additional deductions not listed on the initial summary so that the net income from each summary remains the same. The only logical explanation of these summaries is that the second summary was prepared only after respondent became aware of Mr. Rowell's return preparation work in an attempt to create the appearance that these fees were included on petitioners' tax return when in fact they were not. Petitioner's failure to keep complete and accurate records of his tax return preparation activities is another indication of fraudulent intent. Estate of Mazzoni v. Commissioner,451 F.2d 197 (3d Cir. 1971), affg. a Memorandum Opinion of this Court; Grosshandler v. Commissioner,75 T.C. 1, 20 (1980). The only records petitioners *496 produced in support of net income from tax return activities were a single page typewritten summary for each year. The summaries merely show a total figure for return preparation receipts without any information as to the persons returns were prepared for, the number of returns prepared, or the amount charged per return. Ms. Porterfield claims to have prepared but destroyed contemporaneous records which would have substantiated the summary totals. As an attorney active in the tax area, Mr. Rowell was well aware of his obligation to maintain adequate records. His failure to do so, we are convinced, is attributable to his fraudulent efforts to conceal income. In sum, we conclude that the totality of the evidence clearly shows an intent by Mr. Rowell to evade the payment of taxes due from him within the meaning of section 6653(b) [16]. Accordingly, respondent's determination as to the addition to tax pursuant to that section is sustained. *497 (ii) Negligence If the 50-percent addition to tax for fraud is assessed, respondent may not assess the negligence addition. Sec. 6653(b); sec. 301.6653-1(b)(2)(ii), Proced. & Admin. Regs. We therefore need not consider respondent's alternative position concerning additions to tax under section 6653(a). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. ↩
2. Ms. Porterfield went by the name of Karen Fite during the tax years in issue. ↩
3. The only increase in deposits during the tax years in issue occurred in 1977 to account for a $ 40,000 legal fee which was not deposited into the business account. ↩
4. Although these items were deducted by petitioners in determining gross receipts, they are alleged actually to be deductible business expenses. As such, the propriety of these deductions will be considered later in that context. Respondent's determination that such items should be restored to petitioners' gross receipts↩ was correct. 5. Compare note 4, supra.↩
6. The two worksheets show the same total of gross receipts since other expenses were increased by an amount equal to the $ 5,010 of net tax preparation income appearing on the second worksheet. ↩
7. The amounts deducted in 1977 and 1979 were not shown separately on petitioners' return, but were netted against total deposits in arriving at gross receipts appearing on line 5 of Schedule C. See note 4. ↩
8. No explanation has been given for the discrepancy between the $ 1,500 claimed on the return and disallowed, and the $ 1,700 in bad debt claimed at trial. ↩
9. We reject respondent's assertion that no debt arose until the case was settled in favor of petitioner's client and an obligation to repay the advanced amount arose. Our view is that the debt came into existence at the time the advance was made, and that the debt would be forgiven by petitioner if his client lost the case. ↩
10. Petitioners' listing of items in dispute totals $ 3,892.38 for 1978 and $ 1,008.89 for 1979. The 1978 listing includes $ 1,340.62 of items respondent had not disallowed and does not contain $ 602.95 of items disallowed by respondent which we treat as having been conceded. The 1979 listing contains $ 347.22 of items not disallowed, omits $ 1229.18 of items which had been disallowed which we treat as having been conceded and contains a new item of $ 26.29 for which petitioners now seek a deduction. Respondent's listing of disallowed items in 1979 apparently contains a $ 52.50 footing error. Thus, the office supplies deductions in controversy are as follows: ↩
1978
1979
Per Notice of Deficiency
$ 4,245.32 $ 871.71 Capitalized
(1,090.61)
(159.65)
$ 3,154.71 $ 712.06 Conceded by Petitioners
(602.95)
(129.18)
Additional Deduction
26.29 Footing Error
52.50 $ 2,551.76 $ 661.67 11. Petitioners' listing claims deductibility of a check in the amount of $ 468.74 is in dispute. However, respondent only disallowed $ 391.91 of this check. ↩
12. We decline to invoke the Cohan rule to estimate the deduction for automobile expenses to which petitioners may be entitled since the record provides no basis for the making of such an estimation. See Williams v. United States,245 F.2d 559, 560↩ (5th Cir. 1957). 13. Respondent disallowed $ 3,993.59 of Schedule E depreciation in his notice of deficiency; however his supporting schedule indicates only $ 3,933.59 was to be disallowed. We treat this latter figure as the amount of controversy. ↩
14. See also Walt Wilger Tire Co. v. Commissioner,T.C. Memo. 1979-66↩. 15. As relevant here, sec. 6653(c)(1) defines "underpayment" for sec. 6653 purposes, as equivalent to a "deficiency" as defined under sec. 6211. ↩
16. Although neither party brought this matter to our attention, it is obvious that respondent has only proven that petitioner-husband fraudulently intended to evade Federal income tax. Sec. 6653(b) in part, provides: "In the case of a joint return under sec. 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse." Respondent has not shown that any part of the underpayment is due to fraud on the part of Mrs. Rowell. The addition to tax under sec. 6653(b) is not applicable to Mrs. Rowell for any of the 3 taxable years in issue. However, Mrs. Rowell has not otherwise alleged or proven that she is an "innocent spouse" within the meaning of sec. 6013 for any of the 3 taxable years in issue. Thus, Mrs. Rowell is jointly and severally liable with Mr. Rowell for the income tax deficiency for each of the years at issue, but she is not liable for any addition to tax under sec. 6653(b). Stone v. Commissioner,56 T.C. 213, 226-228↩ (1971).